[Cite as *State v. Hagwood*, 2026-Ohio-2564.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

KING ISAIAH HAGWOOD, JR.,

        Defendant-Appellant.

CASE NO. 2025-L-113

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2025 CR 000497

---

## OPINION AND JUDGMENT ENTRY

Decided: July 6, 2026
Judgment: Affirmed in part, reversed in part, and remanded

---

*Charles E. Coulson*, Lake County Prosecutor, and *Teri R. Daniel*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Paul M. Kelley*, 44 Nancy Avenue, Akron, OH 44319 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1}   Appellant, King Isaiah Hagwood, Jr., appeals the judgment of the Lake County Court of Common Pleas, after a trial to the bench, convicting him of aggravated robbery and receiving stolen property, with several firearm specifications. Mr. Hagwood was sentenced to an indefinite, aggregate term of 11 to 13 years. Mr. Hagwood challenges various issues, including the sufficiency and weight of the evidence; the admissibility of certain evidence; trial counsel's effectiveness; as well as the trial court's eventual sentence. We affirm in part, reverse in part, and remand for the limited purpose of the trial court to correct a basic aspect of Mr. Hagwood's sentence.

## I. Substantive Facts and Procedural Posture

{¶2}    On July 3, 2024, at approximately 3:30 p.m., Nicholas Northup was driving a 2021 red Ford Explorer SUV in Shaker Heights, Cuyahoga County, Ohio. A gold sedan in front of Mr. Northup stopped next to a parked vehicle blocking the Explorer. A hooded individual with a medical mask exited the passenger side of the gold sedan. He pointed a silver handgun at Mr. Northup and demanded he surrender the Explorer. Mr. Northup complied, and he was advised to lay on the ground, count to 100, and not to look back.

{¶3}    After the incident, because his cell phone was still in the Explorer, Mr. Northup walked to a nearby house and called police. Once police arrived, Mr. Northup advised officers that his assailant was a black male, wearing a black hood, with a surgical mask. He also stated the male had dreadlocks approximately 10-inches long. Officers obtained information relating to the color, make, and model of the SUV. They also obtained the license-plate number. A "be-on-the-lookout" ("BOLO") was issued for the stolen vehicle.

{¶4}    At approximately 8 p.m. on July 3, 2024, Beena Bandwalker was in her vehicle, in the parking lot of her apartment complex (located in Willoughby Hills, Lake County, Ohio), waiting for a FedEx delivery. Two men approached the driver's side of her car from behind and demanded her keys and phone. Although frightened, she did not comply. One of the men made a second demand and brandished a handgun from his waistband. He held the firearm to Ms. Bandwalker's head, but a red SUV appeared, and a person in the driver's side of that vehicle yelled "let's go, let's go." The men retreated to the SUV which sped off without Ms. Bandwalker's belongings.

{¶5}   Ms. Bandwalker immediately alerted the security officer patrolling her apartment complex, who notified police of the incident. Ms. Bandwalker described the man with the firearm as an African American male, with dreadlocks, and a hoodie. She indicated the suspect had a medium to slim build and appeared to be between 20-25 years old. Although she stated she was not generally familiar with firearms, the handgun the suspect brandished was a "silver-gray looking gun." Ms. Bandwalker was shown a photo array and identified Mr. Hagwood with 80-85 percent certainty. Mr. Hagwood was 18 years old at the time of the incident(s).[1]

{¶6}   Flock cameras around Ms. Bandwalker's apartment complex recorded the vehicle she described entering the complex at 8:03 p.m. and exiting at 8:06 p.m. Lake County Sheriff Sergeant Sarah McCulloug, stated: "The Flock system is a web based program that we get alerts from that send[s] us . . . with warrants, stolen vehicles, stolen license plate, missing people that will alert us. We can also utilize that in searching for license plates that were given to see if we can find, locate a vehicle."

{¶7}   Sergeant McCulloug pointed out that the information is sent through LEADS (Law Enforcement Automated Data System) and "hits" on cameras in the Flock system to alert, inter alia, if a stolen vehicle has been potentially identified. The license plate on the vehicle matched the plate number of the SUV stolen from Mr. Northup earlier that day.

{¶8}   Shaker Heights Detective Volodymyr Savka stated that, after receiving the BOLO, he responded to reports of "pinging" from Mr. Northup's phone. Detective Savka stated that "pinging" referred to the location of a cell phone in a particular location. According to the detective, Mr. Northup was using "an iPhone app to locate his phone."

---

1. The underlying matter pertains only to the specific crimes committed in Lake County, Ohio.

Case No. 2025-L-113

He noted that the pinging was traced to a location "going in the westbound direction" into Cleveland. Shaker Heights officers ultimately recovered Mr. Northup's phone. It is unclear whether the phone was discarded or found in Mr. Northup's Explorer.

{¶9} In the early hours of July 4, 2024, the Explorer was found traveling in Cleveland, Ohio. Officer Jeremiah Jones, a patrolman for the Cleveland Police Department, stated he received a BOLO from Shaker Heights Police Department. Officer Jones asserted: "They advised us there was a red Ford SUV that was stolen out of their city as an aggravated robbery indicating that it was done violently and they just wanted to make us aware that it was last seen heading into our city." Officer Jones and his partner observed a red Ford Explorer SUV matching the description and confirmed that the license plate number was registered to Mr. Northrup's vehicle.

{¶10} The Cleveland officers initiated a pursuit. Ultimately, the passenger in the vehicle left (or "bailed") the vehicle and was apprehended. The driver of the vehicle left the vehicle as well, leaving the SUV still in "drive." Officer Jones observed, "we heard that the passenger of a vehicle had bailed and had been quickly apprehended and detained. The driver of the vehicle then fled from the driver's side and continued running westbound towards where we were at." As a result, the officer observed "a black male[,] black hoodie[,] black pants running westbound from the vehicle that's when me and my partner then engaged in a foot pursuit."

{¶11} Officer Jones noted that his partner chased an individual whom he caught. Officer Jones' partner radioed that he had the male at gunpoint. Officer Jones located his partner who was in the process of arresting an individual later identified as Mr. Hagwood. Officer Jones identified Mr. Hagwood in court and also stated he found a black hoodie

approximately 15 feet away from the suspect. Officer Jones repeatedly stated that throughout the arrest process as well as the booking or "intake" process, he did not observe any tattoos on Mr. Hagwood.

{¶12} Seth Dodson, a public-safety-intelligence analyst for the Ohio State Highway Patrol Intelligence Unit, reviewed the cell phone and geo-location data analysis provided by AT&T, Mr. Hagwood's cell phone carrier. Mr. Dodson stated he is a "subject matter expert" in this area (referred to as Trax) and, since 2017, has been involved in "well over 300" cases relating to geo-location records analysis. Trax is a program created to trace separate phone records provided by cell-phone providers—in this case, AT&T.

{¶13} Mr. Dodson observed that he received the certificate of authenticity of the records from AT&T. No objection was made to the introduction of these records or to Mr. Dodson's eventual analysis of the same.

{¶14} Mr. Dodson received data from AT&T which provided the name of the person on the account, the phone number, and the subscriber's address. This data matched Mr. Hagwood's device. The data also allowed Mr. Dodson to review the locations assigned to the phone during particular time frames which permitted him to know "what cell site or cell tower and sector [that] was utilized for specific communications . . . ." Mr. Dodson stated that the "towers" are not necessarily physical towers but involve subsets of hardware that can "be on buildings, they can be in trees, [the provider] can move them around depending on if there's a large event going on [around] these cell sites . . . for their subscribers to be able to utilize their devices" seamlessly.

{¶15} Mr. Dodson indicated the most important aspects of the data he assessed are "the cell tower latitude and cell tower longitude, the cell ID, the sector orientation that's

Case No. 2025-L-113

going to show us which sector was utilized for that particular timing [when] events hit." (Sic.) He also noted that the "latitude and longitude" provides "AT&T's estimate of where that device is at the time."

{¶16}  Mr. Dodson explained he utilized Google Earth, in conjunction with Trax, to trace a cell site or cell tower. Trax then maps the radio frequency for a cell phone reading. Mr. Dodson stated that "[o]nce you download the Google Earth file from Trax this is call[ed] the time bar slider so it will show where we're at in time within these records."

{¶17}  Mr. Dodson emphasized that the timing-evidence-data technology is used "all the time, not just in criminal cases[,] we use it in exigent cases where we have maybe a missing elderly person[;] as the highway patrol we deal with those a lot where we're trying to locate someone. We used [sic] them in cases where we have a missing person, maybe an Amber alert we've used them. We've recovered dead bodies I guess for a lack of a better term with this type of data."

{¶18}  Mr. Dodson provided the estimated time frame coverage and location from the cell phone ascribed to Mr. Hagwood, observing, among other things, that "between 6:00 p.m. and 6:30 the device continues to move west. From 6:31 to 6:59 the device moves south. From 7:00 p.m. to 7:50 the device moves north and then northeast. From 7:51 p.m. until 8:05 p.m. the device continues to move northeast and then starts moving south."  At approximately 8:05 p.m., Mr. Hagwood's cell phone was "likely in [the] general vicinity" of 2250 Par Lane—near the Par Lane Flock camera that captured the red Explorer SUV going into Ms. Bandwalker's apartment complex at 8:03 p.m. and exiting the same at 8:06 p.m.

Case No. 2025-L-113

{¶19} As part of the investigation, Mr. Hagwood's phone was analyzed, and DNA was taken from the Explorer. Analysis of Mr. Hagwood's phone revealed a photograph of him sitting on a vehicle matching the stolen Explorer as well as videos from July 3, 2024, of Mr. Hagwood with a co-defendant. Also, as noted, the analysis of Mr. Hagwood's cell phone-location data placed him in the location of the attempted theft of Ms. Bandwalker's vehicle. Significantly, the same data placed him in the same general vicinity as his co-defendant throughout the day. Finally, DNA found inside the Explorer was deemed statistically more likely to be that of Mr. Hagwood and Mr. Northup than Mr. Northup and unknown persons.

{¶20} On May 23, 2025, Mr. Hagwood was indicted on one count of aggravated robbery, a felony of the first degree, in violation of R.C. 2911.01(A)(1), with an accompanying firearm specification, pursuant to R.C. 2941.145 (the incident involving Ms. Bandwalker); one count of attempted grand theft of a motor vehicle, a felony of the fifth degree, in violation of 2913.02(A)(1), with an accompanying firearm specification, pursuant to R.C. 2941.145 (again, pertaining to the incident relating to Ms. Bandwalker); and one count of receiving stolen property, a felony of the fifth degree, in violation of R.C. 2913.51(A), with an accompanying firearm specification, pursuant to R.C. 2941.141 (this count related to the initial theft of Mr. Northup's Explorer). Mr. Hagwood pleaded "not guilty" to the counts and specifications.

{¶21} The matter proceeded to trial where, after voir dire, Mr. Hagwood elected to be tried to the bench. After receiving evidence, the trial court found Mr. Hagwood guilty as charged in the indictment. The trial court ordered a presentence investigation report and, after a sentencing hearing, Mr. Hagwood was sentenced to an indefinite term of

imprisonment of four to six years on the aggravated robbery count and a definite term of 18 months on the receiving stolen property count. The trial court determined the attempted grand theft of a motor vehicle count would merge with the aggravated robbery count, and the State elected to proceed to sentencing on the aggravated robbery count. Regarding the specifications, Mr. Hagwood was ordered to serve mandatory firearm specifications as follows: three years on the aggravated robbery count, three years on the attempted grand theft of a motor vehicle count, and one year on the receiving stolen property count. This appeal follows.

{¶22} Mr. Hagwood assigns eleven errors for this court's review. His first assignment of error provides:

**II. Sufficiency and Weight of the Evidence**

{¶23} "The State failed to present sufficient evidence of identity."

{¶24} Although Mr. Hagwood nominally makes a sufficiency challenge, he also, however, challenges the weight of the evidence in his brief. We shall address each aspect of his argument(s).

{¶25} "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Dent*, 2020-Ohio-6670, ¶ 15, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶26} Unlike the standard for the sufficiency of the evidence, the "[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence* . . . to support one side of the issue rather than the other.'" (Emphasis in original.) *State v.*

*Thompkins*, 1997-Ohio-52, ¶ 24, quoting *Black's Law Dictionary* (6th Ed. 1990). When considering challenges to the weight of the evidence, an appellate court reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [fact-finder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at ¶ 25, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at ¶ 25, quoting *Martin* at 175.

{¶27} Thus, a conclusion that a conviction is supported by the weight of the evidence necessarily includes a determination that the State produced sufficient evidence in support of the conviction. *State v. DiBiase*, 2012-Ohio-6125, ¶ 38 (11th Dist.).

{¶28} In this matter, Mr. Hagwood asserts the conviction is unsupported by the evidence because Ms. Bandwalker did not make an in-court identification and her testimony confirmed "deep uncertainty." He additionally takes issue with the description of his hair length, and the victims' descriptions of the firearm, his clothing, and his physical size.

{¶29} First, Mr. Hagwood challenges the lack of any in-court identification by an eyewitness.

{¶30} "It is well-settled that, in order to warrant a conviction, the evidence must establish beyond a reasonable doubt the identity of the accused as the person who actually committed the crime." *State v. Lawwill*, 2008-Ohio-3592, ¶ 11 (12th Dist.), citing *State v. Scott*, 3 Ohio App.2d 239, 244 (7th Dist. 1965). There is no general

Case No. 2025-L-113

requirement, however, "that the defendant must be visually identified in court by a witness." *Lawwill* at ¶ 11, citing *Scott* at 244. Rather, direct or circumstantial evidence is sufficient to establish the identity of the accused as the person who committed the crime. *State v. Irby,* 2004-Ohio-5929, ¶ 16-21 (7th Dist.).

{¶31} "[C]ircumstantial evidence and direct evidence inherently possess the same probative value." *State v. Fasline*, 2015-Ohio-715, ¶ 39 (11th Dist.), citing *State v. Biros*, 1997-Ohio-204, ¶ 65. "Circumstantial evidence has been defined as testimony not grounded on actual personal knowledge or observation of the facts in controversy, but of other facts from which inferences are drawn, showing indirectly the facts sought to be established." *State v. Payne*, 2014-Ohio-4304, ¶ 22 (11th Dist.), citing *State v. Nicely*, 39 Ohio St.3d 147, 150 (1988). "An inference is 'a conclusion which, by means of data founded upon common experience, natural reason draws from facts which are proven.'" *State v. Windle*, 2011-Ohio-4171, ¶ 34 (11th Dist.), quoting *State v. Nevius*, 147 Ohio St. 263 (1947). "It consequently follows that 'when circumstantial evidence forms the basis of a conviction, that evidence must prove collateral facts and circumstances, from which the existence of a primary fact may be rationally inferred according to common experience.'" *State v. Armstrong*, 2016-Ohio-7841, ¶ 22 (11th Dist.), quoting *Windle* at ¶ 34.

{¶32} "While it is unquestionably the better practice to obtain an in-court identification of a defendant, the state is not precluded from proving identity by indirect means when a witness cannot or will not provide such identification." *State v. Nicholson*, 2009-Ohio-518, ¶ 52 (6th Dist.), citing *State v. Porter*, 1999 WL 1271722 (8th Dist. Dec. 30, 1999). In effect, the lack of an in-court identification, in light of other surrounding

Case No. 2025-L-113

evidence, simply goes to the weight of the evidence offered in support of the State's burdens of persuasion.

{¶33} Consequently, the absence of a defendant's in-court identification at trial does not imply there was insufficient evidence of identity or that the conviction is against the weight of the evidence. *Lawwill*, 2008-Ohio-3592, at ¶ 13.

{¶34} In this matter, Ms. Bandwalker perceived her assailant to be an African American, younger man, with a slim build, wearing a hoodie, with shoulder length dreadlocks. She also observed he pointed a "silver-gray" handgun to her head. Ms. Bandwalker picked Mr. Hagwood from a photo array after the attempted robbery. There is no indication that the photo array was unfairly or even remotely suggestive, a fact that Mr. Hagwood eventually concedes in his brief. And, given the circumstances of the incident and considering Ms. Bandwalker's perception of Mr. Hagwood's appearance at the time of the attempted robbery, she identified Mr. Hagwood in the array with an 80-85 percent degree of certainty. This evidence goes to the weight of the victim's testimony.

{¶35} Moreover, there *was* in-court identification by Cleveland Police Officer Jeremiah Johns that Mr. Hagwood was one of two individuals arrested after abandoning the stolen red Explorer. The vehicle had the license plates of the vehicle that caused the initial BOLO. Officer Johns described Mr. Hagwood at the time of arrest, and his physical description of Mr. Hagwood substantially traced the (albeit limited) physical description provided by Ms. Bandwalker.

{¶36} Mr. Hagwood also takes issue with the lack of tattoos observed by Ms. Bandwalker, as well as the arresting officer's testimony that he observed no tattoos on Mr. Hagwood's person at booking. He maintains he is "covered in tattoos, especially in

the facial area . . . ." In Mr. Hagwood's interview, which occurred over nine months after the date of the offenses, he had tattoos on his neck. In an interview that was played for the trial court, Mr. Hagwood discusses his tattoos; he first indicates he recently obtained the neck tattoo, then changed his story.

{¶37} Similarly, the initial victim, Mr. Northrup, stated that the thief of his red Explorer had shoulder length dreadlocks. Ms. Bandwalker's and Officer Johns' description matched this description. Additionally, although Mr. Northrup could not conclusively identify the thief, he testified the man was an African American male, with a hoodie, who brandished a silver firearm. Ms. Bandwalker testified that the firearm her assailant brandished was a "silver-gray looking gun." The testimony of both victims, in this respect, match.

{¶38} Furthermore, Flock cameras identified Mr. Northrup's stolen vehicle near the scene of the attempted robbery of Ms. Bandwalker's apartment at or near the time of the incident. Within hours, the same vehicle was stopped in Cleveland where the occupants, one of whom was identified as Mr. Hagwood, fled and were subsequently arrested.

{¶39} Mr. Hagwood asserts that his clothes did not match the descriptions offered by victims or the testifying officer. This, however, ignores Officer Johns' testimony that he and his partner arrested Mr. Hagwood after they observed him abandoning the stolen Explorer. It also ignores the fact that Officer Johns noted that Mr. Hagwood, matching the physical description offered by the victims, was arrested near a cast-aside black hoodie and the stolen Explorer SUV.

**{¶40}** Additionally, the State presented evidence of cell-phone-location movements ascribed to Mr. Hagwood's phone on the day and evening in question. These records demonstrated that Mr. Hagwood traveled from Cleveland to Willoughby Hills and then back to Cleveland during the time of the offenses. Mr. Hagwood's cell phone also disclosed a photo of him on the hood of what appeared to be the stolen Explorer on the day of the incident.

**{¶41}** Considering the foregoing, there was evidence by which the trial court could have found, beyond a reasonable doubt, that Mr. Hagwood was the individual who attempted to take Ms. Bandwalker's vehicle and her personal effects at the time of the incident. There was ample evidence, direct and circumstantial, to support the trial court's verdict.

**{¶42}** Mr. Hagwood's first assignment of error is without merit.

### III. Alleged Error in Admitting DNA Evidence

**{¶43}** Mr. Hagwood's second assigned error provides:

**{¶44}** "The trial court erred in admitting unreliable DNA evidence consisting of partial and mixed profiles without conducting a *Daubert* hearing, in violation of Evid. R. 702(C)."

**{¶45}** Under this assignment of error, Mr. Hagwood asserts that the trial court erred when it failed to, sua sponte, hold a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-590 (1993) and Evid.R. 702(C), relating to the "mixed sample" DNA evidence submitted by the State at trial. Curiously, Mr. Hagwood "essentially challenges DNA testimony as if trial courts had never accepted DNA evidence before." *State v. Adams*, 2004-Ohio-5845, ¶ 79. Courts have, and the Supreme Court of

Ohio has, emphasized that a *Daubert* hearing is not prima facie necessary because "DNA evidence, premised on valid scientific principles, has been widely accepted as reliable and admissible evidence." *Adams* at ¶ 86, citing *State v. Pierce*, 1992-Ohio-53, ¶ 12. The Court emphasized:

> Courts throughout the nation and in Ohio routinely accept DNA evidence. [*See*] George Bundy Smith & Janet A. Gordon, The Admission of DNA Evidence in State and Federal Courts (1997), 65 Fordham L.Rev. 2465, 2482-2483, 2488. [*See also*] *State v. Satta,* 2002-Ohio-5049, . . .¶ 44 [(3d Dist.)] ("the credibility of the D.N.A. testing . . . is a matter to [be] determined by the trier of fact"); *State v. Martin* . . . 2000 WL 1145465 [(12th Dist. Aug. 14, 2000)] ("Questions regarding the reliability of DNA evidence . . ., including alleged defects or limitations of DNA population frequency statistics, go to weight of the evidence rather than its admissibility[.]"); *State v. Honzu* . . . 1995 WL 326214, * 8 [(10th Dist. June 1, 1995)] (questions regarding DNA testing procedures go to weight not admissibility). [*See also*] Smith & Gordon, 65 [Fordham ]L.Rev. at 2470 (PCR analysis [one of several DNA typing techniques] "has received overwhelming acceptance in the scientific community and the courts").

*Adams* at ¶ 86.

{¶46}   Accordingly, because DNA evidence has been used in criminal cases for many decades and is no longer considered to be novel or unusual, *Daubert* hearings are not fundamentally necessary. *Adams* at ¶ 80. Rather, considering the established scientific strength and reliability of DNA evidence, defense attorneys are expected to educate themselves regarding DNA evidence to sufficiently conduct cross-examination of the state's witnesses. *State v. Alltop*, 2014-Ohio-1695, ¶ 16 (12th Dist.) ("[T]here are ample materials available by which resourceful counsel can educate himself [or herself] sufficiently to formulate an effective cross-examination.").

Case No. 2025-L-113

{¶47} We consider these points to be equally applicable to mixed-DNA profiles when an adequate foundation is set forth by a qualified expert witness.

{¶48} Considering this backdrop, trial counsel did not object, and as a result, we review Mr. Hagwood's argument for plain error. *State v. Lang*, 2011-Ohio-4215, ¶ 108. "An alleged error is plain error only if the error is 'obvious,' and 'but for the error, the outcome of the trial clearly would have been otherwise.'" *Id.*, quoting *State v. Barnes*, 2002-Ohio-68, ¶ 20; and *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Barnes* at paragraph three of the syllabus.

{¶49} Pursuant to Evid.R. 702, a witness may testify as an expert if: (1) the testimony "relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;" (2) "[t]he witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;" and (3) the "testimony is based on reliable scientific, technical, or other specialized information . . . ." Mr. Hagwood takes issue with the third prong of the foregoing test claiming "the State presented no testimony establishing the reliability of interpreting [the DNA] mixtures." We do not agree.

{¶50} In this matter, Jessica Ritchie, a forensic technician for the Lake County Crime Laboratory ("LCCL"), testified she received DNA samples from investigators. Ms. Ritchie testified the LCCL is an accredited institution in DNA analysis and testified to the chain of custody of all evidence received by the lab. Ms. Ritchie stated she examines the evidence and provides data to the DNA analyst for interpretation.

{¶51} Dr. Karen Zavarella is the DNA supervisor for LCCL. She analyzes and performs DNA casework which includes DNA interpretation of the DNA samples prepared by a technician. Dr. Zavarella testified she has a master's degree and a PhD in molecular biology and has been qualified as an expert in cases "upwards 50 approximate times." Dr. Zavarella testified that, once she provides a DNA interpretation she is "confident and certain that [her] results are reliable and accurate."

{¶52} Mr. Hagwood claims certain "red flags" should have prompted the trial court to hold a hearing on the reliability of Dr. Zavarella's interpretations. The alleged "red flags," however, were discussed by Dr. Zavarella and, indeed, parts of the evidence were favorable to Mr. Hagwood.

{¶53} Specifically, Mr. Hagwood asserts: "the State introduced DNA evidence (State's Ex. 16) consisting of partial and mixed profiles. No *Daubert* hearing was held, and . . . [t]he analyst testified to obtaining merely partial mixed profiles of DNA . . . The report stated some results we[r]e inconclusive due to mixture . . . Importantly, the analyst conceded on cross-examination that as to the DNA profile collected from the driver's side door at least, defendant Hagwood was entirely excluded as a contributor."

{¶54} Dr. Zavarella explained that LCCL does not interpret genetic profiles that indicate greater than three contributors. Accordingly, if there were more than three contributors, LCCL does not make any interpretation or comparisons.

{¶55} Even if Mr. Hagwood was excluded from the door handle, however, the DNA swabs taken from the Explorer's gear shift and steering wheel demonstrate a mixture which allowed interpretation. Dr. Zavarella stated:

> A portion of this mixture matches the standard from Nicholas
> Northrup as would be expected as the primary operator of the

Case No. 2025-L-113

vehicle. And assuming that Nicholas Northup is one of those contributors this DNA mixture profile is 1.2 million times more likely to occur if the mixture consists of DNA from Nicholas Northup, King Isaiah Hagwood and one unidentified contributor than it just derives from Nicholas Northup and two unidentified contributors.

{¶56} Given the mixture, Dr. Zavarella was able to exclude Mr. Hagwood's co-defendant and Mr. Northup's girlfriend. The State asked Dr. Zavarella whether this meant that those people never touched these areas in the vehicle. She responded: "What this means is I could not detect them within the profile in terms of a statistical association . . . [And] [w]e report anything greater than a million times more likely and in the field of forensics a very conservative reporting because a million times more likely is considered in the field of forensics a strong association."

{¶57} Dr. Zavarella discussed the nuances of the process of interpreting the data received from the technician. She also testified to the scientific reliability of the process and to her qualifications as an expert. We find no error in the trial court's admission of Dr. Zavarella's testimony and reports. The introduction of the evidence, in effect, went to the weight accorded the testimony and data, not its admissibility. *See Adams*, 2004-Ohio-5845, at ¶ 79, 86.

{¶58} Moreover, and significant to the plain error analysis, Mr. Hagwood cannot demonstrate the outcome of the trial would have been different if the DNA evidence was not admitted. If the DNA evidence was not introduced, Mr. Hagwood was identified by Ms. Bandwalker with 80-85 percent certainty. The stolen Explorer was placed near Ms. Bandwalker's apartment complex via Flock cameras at or near the time of the incident in question, *and* Mr. Hagwood was apprehended leaving/fleeing the stolen Explorer. Even

if the DNA evidence were excluded, we cannot conclude the outcome of the trial clearly would have been otherwise.

{¶59} Mr. Hagwood's second assignment of error lacks merit.

### IV. Alleged Error in Admitting Cell-Site Location Analysis

{¶60} For his third assignment of error, Mr. Hagwood asserts:

{¶61} "The trial court erred in admitting historical cell-site location analysis without confrontation of the underlying data analyst, in violation of the Sixth Amendment's Confrontation Clause."

{¶62} Under this assigned error, Mr. Hagwood argues the trial court erred by not sua sponte excluding AT&T cell-site records because the "mapping analysis" offered by the State was "testimonial" in nature. Hence, Mr. Hagwood maintains the Sixth Amendment's Confrontation Clause was violated. We do not agree.

{¶63} The Sixth Amendment to the United States Constitution, in its Confrontation Clause, preserves the right of a criminal defendant "to be confronted with the witnesses against him." In *Crawford v. Washington,* 541 U.S. 36, 53-54 (2004), the Supreme Court of the United States stated that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." The key issue is what constitutes a testimonial statement: "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington,* 547 U.S. 813 (2006).

{¶64} In *Crawford,* the Court suggested that business records are "by their nature" non-testimonial. *Id.* at 56. In *State v. Craig,* 2006-Ohio-4571, the Supreme Court of Ohio stated that business records "'are not testimonial in nature because they are prepared in the ordinary course of regularly conducted business and are "by their nature" not prepared for litigation.'" *Id.* at ¶ 82, quoting *People v. Durio,* 794 N.Y.S.2d 863 (2005).

{¶65} The United States Supreme Court, however, clarified that a Confrontation Clause issue can arise "if the regularly conducted business activity is the production of evidence for use at trial." *Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 321 (2009). Considering this point, in *State v. Hood*, 2012-Ohio-6208, the Supreme Court of Ohio considered the impact of cell-phone records in the context of business records. In *Hood*, the Court observed:

> [T]he regularly conducted business activity of cell-phone companies is not the production of evidence for use at trial. The fact that records are used in a trial does not mean that the information contained in them was produced for that purpose. Even when cell-phone companies, in response to a subpoena, prepare types of records that are not normally prepared for their customers, those records still contain information that cell-phone companies keep in the ordinary course of their business.

*Id.* at ¶ 36.

{¶66} Because cell-phone records reflect "only a formatting of information that already exists as a part of the company's day-to-day business[,]" the Court determined such records, when properly authenticated, are non-testimonial. *Id.* at ¶ 38, 42.

{¶67} Mr. Hagwood challenges the State's use of the testimony provided by Seth Dodson. Mr. Dodson is a member of the Ohio State Highway Patrol Intelligence Unit. His main responsibility is cell-phone and geo-location analysis. He uses a system called Trax,

Case No. 2025-L-113

which assists him in mapping data provided by cell phone companies. Mr. Dodson has been deemed a subject-matter expert in the use of the Trax program and thus an expert in the use of such data mapping.

{¶68} Using his expertise, Mr. Dodson used "the electronic records and . . . put them into Trax which then produces a Google or file list, most if not all [of] the analysis is done within Google Earth." He stated, in the course of his analysis, the phone attributed to Mr. Hagwood's cell-phone number was in the same vicinity as the underlying incident as well as the same vicinity as his co-defendant's phone.

{¶69} Mr. Dodson used authenticated AT&T business records and analyzed them using a program that he has been declared a subject-matter expert to examine and draw conclusions. He was cross-examined and did not rely upon testimonial records for either his analysis or testimony.

{¶70} It bears emphasis that the use of Google Earth technology has been held acceptable for purposes of judicial notice. In *State v. Bradford*, 2018-Ohio-1417, ¶ 68-70 (8th Dist.), the Eighth Appellate District observed:

> "Generally, an appellate court may take judicial notice of any fact of which the trial court could have taken notice, even where the trial court failed to do so." *Twinsburg v. Wesby*, [2012-Ohio-569, ¶ 5 (9th Dist.)], citing *Day v. Day*, 40 Ohio App.3d 155, 160, [fn. 4 (10th Dist. 1988)].
>
> An appellate court has authority to take judicial notice regarding the characteristics of the streets of the jurisdiction. *State v. Thomas*, [1993 WL 9719, 3, fn. 2 (11th Dist.] Jan. 8, 1993), citing *Day* at fn. 4, *Orose v. Hodge Drive-It-Yourself Co., Inc.*, 132 Ohio St. 607 . . . (1937); and *Bonbright v. Biller*, 67 Ohio App. 421. . . (1st Dist.[ 1941]). "[W]e take judicial notice of a Google map and satellite image as a 'source[] whose accuracy cannot reasonably be questioned.'" *Pahls v. Thomas*, 718 F.3d 1210, 1216, fn. 1 (10th Cir.[ 2013]), quoting *United States v. Perea-Rey*, 680

Case No. 2025-L-113

F.3d 1179, 1182, fn. 1 (9th Cir. 2012) (second alteration in original) (quoting Fed.R.Evid. 201(b)); *see Citizens for Peace in Space v. Colorado Springs*, 477 F.3d 1212, 1218, fn. 2 (10th Cir. 2007) (taking judicial notice of an online distance calculation that relied on Google Maps data).

"'Geography has long been peculiarly susceptible to judicial notice for the obvious reason that geographic locations are facts which are not generally controversial . . . .'" *[Pauls* at 1216, fn. 1]*, quoting *United States v. Piggie*, 622 F.2d 486, 488 (10th Cir.[ 1980]). "*See also* David J. Dansky, *The Google Knows Many Things: Judicial Notice in the Internet Era*, 39 Colo. Law. 19, 24 (2010) ('Most courts are willing to take judicial notice of geographical facts and distances from private commercial websites such as MapQuest, Google Maps, and Google Earth.')." *Pahls* at [1216, fn. 1]*.

{¶71} No objection was made by defense counsel to the evidence and, considering our analysis and persuasive legal authority, we decline to find any error in the admission of the evidence, let alone plain error.

{¶72} Mr. Hagwood's third assignment of error is without merit.

**V. Alleged Error in Admission of Eyewitness Identification Testimony**

{¶73} For his fourth assigned error, Mr. Hagwood claims:

{¶74} "The trial court violated appellant's right to due process by admitting an equivocal and constitutionally unreliable eyewitness identification under the standards set forth in *Neil v. Biggers* and *Manson v. Braithwaite.*"

{¶75} Mr. Hagwood argues that the trial court violated his right to due process by admitting the out-of-court identification by Ms. Bandwalker because he maintains it is unreliable. He relies on *Manson v. Brathwaite*, 432 U.S. 98 (1977) and *Neil v. Biggers*, 409 U.S. 188 (1972). These cases are inapposite to this matter.

{¶76} Mr. Hagwood maintains that, under *Manson*, "reliability is the linchpin in determining the admissibility of identification testimony." *Id.* at 114. He then asserts,

without citation, that "[u]nder *Biggers* and *Manson*, even where the identification procedure is not unduly suggestive, due process prohibits admission of an identification that is so unreliable that it creates a substantial likelihood of misidentification." Mr. Hagwood concedes that there is nothing in the record indicating that police conducted an unduly suggestive procedure.

{¶77} In *Perry v. New Hampshire*, 565 U.S. 228 (2012), the United States Supreme Court rejected Mr. Hagwood's proposition that due process requires a reliability assessment where there are no suggestive police procedures. In *Perry*, the Court observed:

> Perry's argument depends, in large part, on the Court's statement in *Brathwaite* that "reliability is the linchpin in determining the admissibility of identification testimony." 432 U.S., at 114 . . . . If reliability is the linchpin of admissibility under the Due Process Clause, Perry maintains, it should make no difference whether law enforcement was responsible for creating the suggestive circumstances that marred the identification.
>
> Perry has removed our statement in *Brathwaite* from its mooring, and thereby attributes to the statement a meaning a fair reading of our opinion does not bear. As just explained, . . . the *Brathwaite* Court's reference to reliability appears in a portion of the opinion concerning the appropriate remedy *when the police use an unnecessarily suggestive identification procedure*. The Court adopted a judicial screen for reliability as a course preferable to a *per se* rule requiring exclusion of identification evidence whenever law enforcement officers employ an improper procedure. The due process check for reliability, *Brathwaite* made plain, comes into play only after the defendant establishes improper police conduct. The very purpose of the check, the Court noted, was to avoid depriving the jury of identification evidence that is reliable, *notwithstanding* improper police conduct. 432 U.S., at 112-113. . . .

(Emphasis in original.) (Footnote omitted.) *Perry* at 240-241.

Case No. 2025-L-113

{¶78} Because there is no allegation of improper police conduct or unnecessarily suggestive practices, any concerns regarding reliability goes to the weight of the identification, not its admissibility. *State v. Gaines*, 2016-Ohio-1312, ¶ 17 (11th Dist.), citing *State v. Bell*, 2015-Ohio-4775, ¶ 44 (11th Dist.). Once the identification is deemed accordingly admissible, "'no further inquiry into the reliability of the identification is required.'" *State v. Aekins*, 2023-Ohio-322, ¶ 33 (10th Dist.), quoting *State v. Reddy*, 2010-Ohio-3892, ¶ 31 (10th Dist.). We therefore hold the trial court did not err in admitting the evidence.

{¶79} Mr. Hagwood's fourth assignment of error lacks merit.

## VI. Alleged Ineffective Assistance of Counsel – In General

{¶80} For his fifth assigned error, Mr. Hagwood contends:

{¶81} "Trial counsel provided ineffective assistance by failing to competently challenge (1) the equivocal eyewitness identification; (2) the admissibility and foundation of the State's expert cell-site mapping exhibit; and (3) the limited probative value of complex mixed-source DNA evidence."

{¶82} "There is a general presumption that trial counsel's conduct is within the broad range of professional assistance." *State v. Andrus*, 2020-Ohio-6810, ¶ 60 (11th Dist.), citing *State v. Bradley*, 42 Ohio St.3d 136, 142-143 (1989). The burden of establishing ineffective assistance of counsel falls upon the appealing defendant. *State v. Robinson*, 2021-Ohio-1064, ¶ 24 (11th Dist.).

{¶83} "In order to prevail on an ineffective assistance of counsel claim, an appellant must demonstrate that trial counsel's performance fell 'below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's

performance.'" *Andrus* at ¶ 60, quoting *Bradley* at paragraph two of the syllabus (adopting the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)).

{¶84} To demonstrate prejudice, a defendant must establish there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Bradley* at paragraph three of the syllabus. It is worth noting that the prejudice standards for plain error and an allegation of counsel's ineffectiveness are the same. *State v. Keaveney-Padamonsky*, 2025-Ohio-5285, ¶ 48 (11th Dist.), citing *State v. Cervantes*, 2022-Ohio-2536, ¶ 58 (3d Dist.); *see also State v. Rogers*, 2015-Ohio-2459, ¶ 22 ("[T]o establish plain error, "[t]he accused is . . . required to demonstrate a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis in original.) (Citations omitted.)).

{¶85} Under Mr. Hagwood's second, third, and fourth assignments of error, we previously concluded that: (1) no error occurred in the admission of the mixed-source DNA evidence to which Dr. Zavarella testified (assignment of error two); (2) no error occurred in the admission of Mr. Dodson's testimony regarding his expert cell-phone/site mapping and, in particular, there was no Confrontation Clause violation (assignment of error three); and finally, (3) no error occurred in the admission of Ms. Bandwalker's identification testimony (assignment of error four). Thus, Mr. Hagwood's failure to establish prejudice under the plain-error standard in his second, third, and fourth assignments of error is a failure to establish prejudice under the standard for ineffective assistance under this assignment of error. We discern no need to further explore these points.

{¶86} Mr. Hagwood's fifth assignment of error lacks merit.

## VII. Alleged Error in Prosecutor's Closing Argument

{¶87} Mr. Hagwood's sixth assignment of error asserts:

{¶88} "The prosecutor committed misconduct by materially misstating the DNA evidence during closing argument denying appellant a fair trial."

{¶89} Mr. Hagwood did not object to this alleged problem, and thus we only review the argument for plain error.

{¶90} Mr. Hagwood challenges the following aspect of the State's closing argument:

> There was also testimony from the crime lab personnel about the defendant's DNA being present on the combined swab of the steering wheel and gear shift. And the testimony was that it was combined to give the greatest chance of trying to identify and include in the statistical probability the amount of DNA given that it's a high frequency a high use object that was swabbed there.

{¶91} Mr. Hagwood contends the prosecutor's statement was factually incorrect, "scientifically impossible, and it grossly mischaracterized the expert's testimony." Mr. Hagwood claims that the prosecutor's statement was problematic because Dr. Zavarella "never testified that the DNA matched appellant uniquely, that appellant 'was in the car,' or that the statistic excluded 'anyone else in the world.'" While we appreciate the point Mr. Hagwood attempts to make, we do not find the prosecutor's statement erroneous for two reasons.

{¶92} Initially, Dr. Zavarella testified that contact DNA does not frequently provide a significant amount of genetic material. Accordingly, when a scientist swabs multiple areas from the same location in a particular area, those swabs can be combined into one

Case No. 2025-L-113

extraction to create a genetic profile. Under these circumstances, Dr. Zavarella stated the combined extractions from the Explorer's gear shift and the steering wheel yielded three contributors. One contributor *matched* Mr. Northup. Dr. Zavarella then testified that the DNA mixture profile "is 1.2 million times more likely to occur if the mixture consists of DNA from Nicholas Northup, King Isaiah Hagwood[,] and one unidentified contributor than it just derives from Nicholas Northup and two *unidentified* contributors." (Emphasis added.)

{¶93} Dr. Zavarella did not testify, and the prosecutor did not allege, the combined, mixed sample "matched" Mr. Hagwood "uniquely." She did not testify, nor did the prosecutor directly state that Mr. Hagwood was "in the car." Rather, Dr. Zavarella testified and the prosecutor only suggested that Mr. Hagwood was a significantly more likely contributor to the DNA (1.2 million times more likely) than any other unidentified contributors.

{¶94} Finally, Dr. Zavarella did not testify, and the prosecutor did not state, that the model excluded "anyone else in the world." To the contrary Dr. Zavarella only stated that her test excluded Mr. Hagwood's co-defendant and Mr. Northup's girlfriend. In qualifying this point, she stated that her conclusions did not imply that those people did not touch those items, only that she could not detect a profile of those individuals in terms of a "statistical association."

{¶95} Dr. Zavarella went on to clarify to the trial court that LCCL reports only those results "greater than a million times more likely" because "a million times more likely is considered in the field of forensics a strong association." The State's closing argument did not fundamentally misrepresent Dr. Zavarella's testimony or findings.

{¶96} Moreover, and of significant importance, "in a bench trial, 'a judge is presumed to consider only the relevant, material[,] and competent evidence in arriving at a judgment, unless the contrary affirmatively appears from the record.'" *State v. Williams*, 2018-Ohio-974, ¶ 27 (10th Dist.), quoting *State v. Eubank*, 60 Ohio St.2d 183, 187 (1979). Even if we found the prosecutor's characterization problematic, the trial judge is aware that closing arguments are not evidence. We therefore find no error.

{¶97} Mr. Hagwood's sixth assignment of error lacks merit.

## VIII. Alleged Ineffective Assistance for Failing to Object to Claimed Hearsay

{¶98} His seventh assigned error provides:

{¶99} "Trial counsel rendered ineffective assistance by failing to object to pervasive hearsay in BOLO and police testimony."

{¶100} Mr. Hagwood asserts trial counsel was ineffective for failing to object to BOLO information which described the color, make, and license plate number of the stolen SUV. He maintains this was impermissible hearsay and should have been excluded. Further, he asserts, other testimony relating to the BOLO information described the suspect as a "black male, medium length dreads, black hoodie, black pants." Mr. Hagwood emphasizes none of this information was based upon the personal observations of the officers submitting the BOLO and therefore it was inadmissible hearsay.

{¶101} The standard for ineffective assistance of counsel was set forth above. In short, an appealing party must demonstrate his or her counsel was deficient and that the deficiency caused prejudice. *Bradley,* 42 Ohio St.3d 136, at paragraph two of the syllabus. That is, the party must demonstrate there is a reasonable probability that, but

for counsel's errors, the result of the proceedings would have been different. *Id.* at paragraph three of the syllabus.

{¶102} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally, hearsay statements are inadmissible unless the statement comes in under a recognized exception. *See, e.g., State v. Campbell*, 2014-Ohio-493, ¶ 44 (8th Dist.); Evid.R. 802-807.

{¶103} Initially, our research indicates that no Ohio court has specifically addressed this issue. That said, we maintain the out-of-court statements in the BOLO were admissible for the non-hearsay purpose of establishing reasonable suspicion which does not implicate the truth of the matters asserted in the BOLO. The information in the BOLO was used to place law enforcement on notice that would justify a preliminary investigative stop and offer a reasonable, articulable basis regarding why an officer acted. In other words, the BOLO was not offered to prove the truth of its contents, i.e., that the occupants of the suspect red SUV had committed a theft or an aggravated robbery, but was offered to establish that other officers receiving the information might justifiably rely on the details of the BOLO to make a reasonable investigative stop.

{¶104} Put differently, the BOLO, under the circumstances, simply described the factual sequence of events leading to its issuance. It cannot be viewed to represent the truth that a specific event occurred. The BOLO provided a basis for other officers from different jurisdictions that facts have allowed investigators to conclude that, if the vehicle at issue is observed, there is a reasonable basis for its investigation.

Case No. 2025-L-113

{¶105} Assuming, however, for purposes of a complete analysis and Mr. Hagwood's argument that counsel erred in not objecting to the testimony on the basis of hearsay, Mr. Hagwood is still unable to establish prejudice for purposes of an ineffective assistance of counsel analysis.

{¶106} As discussed at length above, other evidence sufficiently and persuasively supports the conclusion that Mr. Hagwood was the individual identified by Ms. Bandwalker at her apartment complex. The vehicle information was used to explain the police investigation and the sequence of events leading to the release of the BOLO alert. To wit, a Ford Explorer was stolen, and the theft was reported to the Shaker Heights Police Department with relevant details about the vehicle. Later that evening, an attempted theft occurred in Willoughby Hills, and Flock cameras were able to capture the license plate of the vehicle taken in the initial theft. These additional circumstantial facts, in conjunction with the ultimate arrest, demonstrate the introduction of the BOLO contents were not prejudicial.

{¶107} We understand and appreciate how the information contained in the BOLO can be generally viewed as inadmissible hearsay because the contents might contain incriminating details unnecessary to establish a sequence of events, e.g., they might suggest the occupants of the vehicle *are* involved in an alleged crime. Here, however, the victim(s) testified to the same information revealed in the BOLO at trial. Therefore, and in this important regard, the admission of the BOLO's contents are, in fact, cumulative and, accordingly, harmless.

{¶108} Mr. Hagwood's seventh assignment of error lacks merit.

## IX. Alleged Sentencing Errors - Generally

{¶109} As they contest alleged sentencing errors, we shall treat Mr. Hagwood's eighth, ninth, tenth, and eleventh assignments of error together. They provide:

> [VIII.] The trial court erred by imposing a third firearm-specification prison term consecutively to the other firearm-specification terms, contrary to R.C. 2929.14(C)(1) and *State v. Beatty*.

> [IX.] The trial court erred by failing to specify which firearm specifications constituted the "two most serious" under R.C. 2929.14(C)(1)(a)-(b), and by instead relying on the repealed R.C. 2929.14(B)(1)(g), rendering its consecutive-specification findings incomplete and unreviewable.

> [X.] The trial court imposed consecutive firearm-specification prison terms in express reliance on a repealed statutory provision, rendering that portion of the sentence contrary to law.

> [XI.] The cumulative effect of the errors at trial deprived Appellant of a fair trial and due process of law.

{¶110} Under his eighth assigned error, Mr. Hagwood argues the trial court erred in consecutively imposing sentence on a third, discretionary firearm specification in violation of *State v. Beatty*, 2024-Ohio-5684. Under his ninth assigned error, he claims the trial court erred by failing to specify which specifications constituted the "two most serious" and by relying on a repealed version of R.C. 2929.14(B)(1)(g). Under his tenth assigned error, Mr. Hagwood argues the trial court imposed consecutive specification terms in express reliance on a repealed statutory provision. Under his eleventh assigned error, he argues cumulative error.

{¶111} R.C. 2953.08(G) governs an appellate court's review of felony sentences, and provides, in relevant part, that after an appellate court's review of the record, it "may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand . . . if it clearly and convincingly finds . . . [t]hat the record does not support the sentencing court's findings under division (B) or (D) of section

2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant; [or] [t]hat the sentence is otherwise contrary to law." R.C. 2953.08(G)(2)(a) and (b); *see also State v. Lamb*, 2023-Ohio-2834, ¶ 9 (11th Dist.); *State v. Gwynne*, 2023-Ohio-3851, ¶ 15 (plurality).

{¶112} For purposes of this matter, a sentence is contrary to law when it does not fall within the statutory range for the offense or offenses. *See, e.g., Lamb* at ¶ 10, quoting *State v. Shannon*, 2021-Ohio-789, ¶ 11 (11th Dist.). As noted above, Mr. Hagwood challenges the "legality" of his sentences.

{¶113} Here, Mr. Hagwood was found guilty of aggravated robbery, a felony of the first degree, with a three-year firearm specification; attempted grand theft of a motor vehicle, a felony of the fifth degree, with a three-year firearm specification; and receiving stolen property, a felony of the fourth degree, with a one-year firearm specification. The trial court determined that the attempted grand theft would merge with the aggravated robbery charge, and the State elected to proceed to sentencing on the aggravated robbery count. In this respect, Mr. Hagwood was not technically convicted of the attempted grand theft, but only of the aggravated robbery count. *See* Crim.R. 32(C) (requiring "[a] judgment of conviction shall set forth the fact of conviction and the sentence"); *see also State v. Whetstone*, 2016 WL 5637253, ¶ 26 (11th Dist.) (where "no sentence was imposed on [a] charge . . . there is no conviction on that charge"); *State v. Whitfield*, 2010-Ohio-2, ¶ 24 ("[A] 'conviction' consists of a guilty verdict *and* the imposition of a sentence or penalty." (Emphasis in original.)).

*A. Application of R.C. 2929.14(B)(1)(g) - Generally*

{¶114} Mr. Hagwood was sentenced to serve an indefinite prison term with a minimum term of four years and a maximum term of six years on the aggravated robbery count and 18 months on the receiving stolen property count. The trial court ordered those sentences to be served concurrently with one another. With respect to the specifications, Mr. Hagwood was ordered to serve two three-year terms for the specifications on the aggravated robbery and the attempted grand theft of a motor vehicle counts, as well as an additional one-year term for the specification on the receiving stolen property count. The specifications were ordered to be served consecutively for an aggregate prison term of 11 to 13 years.

{¶115} R.C. 2929.14(B)(1)(g) provides:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶116} In *State v. Bollar*, 2022-Ohio-4370, ¶ 7, the Supreme Court of Ohio considered the following issue:

> Whether Ohio's legislature has specifically authorized cumulative punishments for multiple firearm specifications that were committed as part of the same act or transaction under the narrowly tailored, specifically designated circumstances set forth in R.C. 2929.14(B)(1)(g), when the underlying felonies attendant to the firearm specifications are merged at sentencing as allied offenses of similar import . . . .

{¶117} The Court answered the question in the affirmative. In doing so, it distinguished its holding in *State v. Whitfield*, 2010-Ohio-2, where it emphasized that R.C. 2941.25(A), Ohio's merger statute, "prohibits 'convictions' for allied offenses." *Bollar* at ¶ 14.

{¶118} The Court in *Bollar*, however, observed that its definition of "conviction" in *Whitfield* "may be seen as creating tension with R.C. 2929.14(B)(1)(g), which applies when 'an offender is convicted of or pleads guilty to' multiple felonies and firearm specifications." *Bollar* at ¶ 15. Nevertheless, the Court "clarified" that its "definition of 'conviction' in *Whitfield*[, requiring the imposition of a sentence to meet the definition of conviction,] does not apply to R.C. 2929.14(B)(1)(g). *Bollar* at ¶ 16. In applying that statutory provision, [courts] simply use the plain meaning of 'convicted': found guilty. *See Black's Law Dictionary* 421-422 (11th Ed. 2019) (defining the verb 'convict' as 'to find (a person) guilty of a criminal offense upon a criminal trial . . . [or] a plea of guilty')." *Id.* at ¶ 16.

{¶119} The Court determined that an offender must, under R.C. 2929.14(B)(1)(g), therefore receive prison terms for the two most serious firearm specifications when the offender is convicted, i.e., found guilty, or pleads guilty to multiple felony offenses. *Bollar* at ¶ 19. And the statute "makes no exception to the application of its provisions when one of the underlying felony offenses has been merged." *Id.*

{¶120} The Court stated that R.C. 2929.14(B)(1)(g)

> requires that the offender receive prison terms for each of the two most serious firearm specifications when the offender pleads guilty to multiple felony offenses (and at least one of those is a felony listed in the statute) and also pleads guilty to multiple accompanying specifications. The statute makes no exception to the application of its provisions when one of the

underlying felony offenses has been merged. Instead, it simply applies whenever the offender has pleaded guilty to (or been found guilty of) multiple felony offenses and multiple specifications.

*Bollar* at ¶ 19.

{¶121} In *Bollar*, the defendant pleaded guilty to multiple felonies and multiple specifications. *Id.* As such, the Supreme Court held the defendant must receive prison terms for the two most serious specifications to which he pleaded guilty, regardless of merger. *Id.*

{¶122} Here, Mr. Hagwood was found guilty of multiple felonies, one of which was a qualifying felony, i.e., aggravated robbery. Even though Mr. Hagwood was "found guilty" after trial rather than pleading guilty prior to a trial, R.C. 2929.14(B)(1)(g) applies with the same force. Therefore, consistent with the compartmentalized definition of a "conviction" the Supreme Court of Ohio offered in *Bollar*, the trial court imposed two, three-year consecutive prison terms for the firearm specifications on the aggravated robbery and the attempted grand theft of a motor vehicle counts, and a consecutive one-year term for the specification on the receiving stolen property count.

### *B. The Firearm Specification on the Merged Attempted Grand Theft Count: Double Jeopardy*

{¶123} We must now examine whether the imposition of the second three-year mandatory specification term — the one attached to the merged attempted grand theft of a motor vehicle count — violates the Double Jeopardy Clauses of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution. We conclude that it does.

Case No. 2025-L-113

{¶124} At sentencing, defense counsel preserved this issue on the record, objecting as follows: "We're going to object to the imposition of both 3 year gun specifications on constitutional grounds. This was, I think it's one course of conduct. I think it's punishing the same conduct in two separate ways so we'd just like the record to reflect our objection." The trial court noted the objection, stating: "I'll note [defense counsel's] objection to the consecutive nature of the firearm specifications in Count 1 and Count 2 which the underlying offense merged with one another." The objection was overruled. The issue is therefore preserved for appellate review. Whether a sentence violates the Double Jeopardy Clause is a question of law, which we review de novo. *State v. Ruff*, 2015-Ohio-995, ¶ 12.

{¶125} The Double Jeopardy Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb. . . ." U.S. Const. amend. V; U.S. Const. amend. XIV, § 1; *Benton v. Maryland*, 395 U.S. 784, 794 (1969). Among the protections afforded by this guarantee is the prohibition against *multiple punishments for the same offense imposed in a single proceeding*. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). *See also State v. Mutter*, 2017-Ohio-2928, ¶ 15. Article I, Section 10 of the Ohio Constitution independently provides that "[n]o person shall be twice put in jeopardy for the same offense." Ohio Const. art. I, § 10. The two constitutional provisions protect against the same perils. Here, we are concerned with the protection against multiple punishments for the same offense.

{¶126} In *Missouri v. Hunter*, 459 U.S. 359, 366 (1983), the United States Supreme Court held that "with respect to cumulative sentences imposed in a single trial, the Double

Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." Under *Hunter*, when a legislature specifically authorizes cumulative punishment, a court may impose cumulative sentences without running afoul of the Double Jeopardy Clause. *Id.* at 368-69.

{¶127} Critically, however, the converse is equally binding: where the elements of two offenses completely overlap—where one is a lesser included offense of the other—multiple punishments are presumptively precluded unless there is "a clear indication of contrary legislative intent." *Whalen v. United States*, 445 U.S. 684, 691-692 (1980); *see Blockburger v. United States*, 284 U.S. 299, 304 (1932).

{¶128} In January 2026, the United States Supreme Court unanimously reaffirmed and strengthened this principle in *Barrett v. United States*, 607 U.S. ___, 146 S.Ct. 482, 223 L.Ed.2d 398 (2026). In *Barrett,* the Court held that the Double Jeopardy Clause prohibited two convictions for a single act that violated two closely related federal firearm offenses—18 U.S.C. 924(c)(1)(A)(i) and 18 U.S.C. 924(j)—where the first was a lesser included offense of the second. Writing for the Court, Justice Jackson held that "[a]ll lesser included offenses are the 'same' as their greater cousins under *Blockburger."* *Id.*, 146 S.Ct. at 491. The Court cited with approval the *Whalen* Court's holding that cumulative punishment for lesser included offenses requires a "'clear indication of contrary legislative intent.'" *Id.*, quoting *Whalen* at 691-692. The *Barrett* Court emphasized that "'[w]hen Congress has the will' to authorize dual punishment for the same offense, Congress 'has no difficulty in expressing it,'" *id.,* 146 S.Ct. at 492*,* quoting *Bell v. United States*, 349 U.S. 81, 83 (1955), and that silence on the point "speaks volumes." *Barrett*, 146 S.Ct. at 492*.* The Court further clarified that the *Blockburger* analysis addresses "the permissibility of

Case No. 2025-L-113

multiple *convictions*, not just multiple sentences," and that "'punishment' means 'a criminal conviction and not simply the imposition of sentence.'" (Emphasis in original.) *Barrett*, 146 S.Ct. at 492-493, quoting *Ball v. United States*, 470 U.S. 856, 861 (1985).

{¶129} Justice Gorsuch's concurrence sharpened the constitutional point further. He questioned whether any legislature may authorize cumulative punishment for the same offense in concurrent prosecutions, observing: "Mr. Barrett really was charged twice for one offense. He really was convicted twice. Before our intervention, he really was set to be criminally punished twice. And whatever Congress might or might not intend, *that* is double jeopardy." (Emphasis in original.) *Barrett*, 146 S.Ct. at 500 (Gorsuch, J., concurring in part). Justice Gorsuch further noted that "in all the years since *Dixon*, we have not found a single case in which the '*Blockburger* presumption' against concurrent prosecutions for the same offense was, in fact, overcome by a clear congressional command." *Id.*, 146 S.Ct. at 499.

{¶130} Applying *Barrett*'s framework to this case, we begin with the relationship between the two offenses at issue. Aggravated robbery under R.C. 2911.01(A)(1) requires proof that the offender, in attempting or committing a theft offense, had a deadly weapon on or about the offender's person or under the offender's control and either displayed the weapon, brandished it, indicated that the offender possessed it, or used it. Attempted grand theft of a motor vehicle requires proof that the offender attempted to knowingly obtain or exert control over a motor vehicle. R.C. 2923.02; R.C. 2913.02(A)(1).

{¶131} The attempted theft is subsumed entirely within the aggravated robbery. It is not merely an allied offense of similar import—it is a constituent element of the greater offense. Aggravated robbery is, in essence, attempted or completed theft plus the

Case No. 2025-L-113

presence, display, or use of a deadly weapon. The trial court correctly recognized this by merging the attempted grand theft count into the aggravated robbery under R.C. 2941.25. This merger determination confirms what the statutory structure compels: these offenses arise from the same conduct, and the attempted grand theft is a lesser included offense of the aggravated robbery.

{¶132} Under *Barrett* and *Blockburger*, the attempted grand theft and the aggravated robbery are therefore the "same offence" for double jeopardy purposes. The firearm specifications attached to each count punish the identical firearm conduct—the display and use of the same firearm during the same criminal episode against the same victim. Imposing a second three-year mandatory specification term for the specification on the merged lesser included offense constitutes cumulative punishment for the "same offence" within the meaning of the Fifth and Fourteenth Amendments.

{¶133} The State argues that the General Assembly "specifically authorized" cumulative specification sentences in R.C. 2929.14(B)(1)(g), invoking *Bollar*'s holding that firearm specifications survive merger of the underlying counts. But *Barrett* teaches that cumulative punishment for the same offense requires a "'clear indication of . . . legislative intent.'" *Id.*, 146 S.Ct. at 491, quoting *Whalen*, 445 U.S. at 692. We are not persuaded that such clarity exists here.

{¶134} In *Whitfield*, 2010-Ohio-2, at ¶ 12, the Ohio Supreme Court held that a "'conviction' consists of a guilty verdict *and* the imposition of a sentence or penalty." (Emphasis in original.) *Id.*, quoting R.C. 2941.25. No sentence was imposed on the attempted grand theft of a motor vehicle count. It merged into the aggravated robbery,

Case No. 2025-L-113

and the State elected to proceed to sentencing on the aggravated robbery count. Under *Whitfield*, there is no "conviction" on the attempted grand theft count.

{¶135} R.C. 2929.14(B)(1)(g) triggers when "an offender is convicted of or pleads guilty to two or more felonies" and accompanying specifications. The Ohio Supreme Court in *Bollar* acknowledged that *Whitfield*'s definition "may be seen as creating tension with R.C. 2929.14(B)(1)(g)," *Bollar*, 2022-Ohio-4370, ¶ 15, and addressed this tension by carving out a narrow exception, holding that "convicted" in (B)(1)(g) means simply "found guilty"—not the *Whitfield* definition. *Bollar* at ¶ 16.

{¶136} R.C. 2929.01(EE) defines "sentence" as "the sanction or combination of sanctions imposed by the sentencing court on an offender who is convicted of or pleads guilty to an *offense*." (Emphasis added.) Likewise, a "sanction," such as a prison term, is "any penalty imposed upon an offender who is convicted of or pleads guilty to an *offense*, as punishment for the *offense*." (Emphasis added.) R.C. 2929.01(DD). These statutory definitions require that there be a predicate "offense" to support a "sentence" or a "sanction." Also, pursuant to the Ohio Revised Code, an "offense" must include a "prohibition." R.C. 2901.03(B) provides that "[a]n offense is defined when one or more sections of the Revised Code state a positive prohibition or enjoin a specific duty, and provide a penalty for violation of such prohibition or failure to meet such duty."

{¶137} A firearm specification cannot be tried on its own because "[it] is, by its very nature, ancillary to, and completely dependent upon, the existence of the underlying criminal charge or charges to which the specification is attached." *State v. Nagel*, 1999-Ohio-507, ¶ 15. It is a "penalty enhancement" for the predicate offense, not its own criminal offense. *State v. Ford*, 2011-Ohio-765, paragraph one of the syllabus. "Moreover,

Case No. 2025-L-113

the placement of R.C. 2941.145 and 2929.14 within the Revised Code confirms that the firearm specification is merely a sentence enhancement, not a separate criminal offense." *Ford* at ¶ 17. Considering these points, "when the trial court sentences a defendant for a firearm specification, it is not sentencing for a separate offense but instead *is imposing additional punishment for the underlying offense*." (Emphasis added.) *State v. Logan*, 2025-Ohio-1772, ¶ 12.

{¶138} *Barrett* requires us to view statutory ambiguity through a constitutional lens. The fact that the *Bollar* Court was required to redefine the established meaning of "conviction" in Ohio law to reach the cumulative-punishment result is itself powerful evidence that the General Assembly did not clearly authorize cumulative specification sentences in this configuration. Indeed, R.C. 2929.14(B)(1)(g) states that a conviction or a plea of guilty triggers multiple firearm specifications. Yet the Supreme Court of Ohio judicially engrafted a definition of "conviction" that was inconsistent with its and the legal community's understanding of the term. If the General Assembly wished to reach this end or goal, it could have provided that a "finding or verdict of guilty or a plea of guilty" would trigger the application of R.C. 2929.14(B)(1)(g). It did not do so.

{¶139} A statute using operative terms that must be read contrary to the State's own Supreme Court definition is, at minimum, ambiguous. *Barrett*'s *Blockburger* presumption resolves that ambiguity against cumulative punishment. As the *Barrett* Court explained, a legislature must provide "'a clear indication'" of intent to authorize cumulative punishment for the same offense. *Id.*, 146 S.Ct. at 491, quoting *Whalen*, 445 U.S. at 691-692. Where the legislature used a term—"convicted"—that under established Ohio law

requires a sentence, and no sentence was imposed on the merged count, the authorization is not clear.

{¶140} Moreover, we observe that R.C. 2929.14(B)(1)(b)—the general rule governing specification sentencing—expressly provides: "Except as provided in division (B)(1)(g) of this section, a court shall not impose more than one prison term on an offender under division (B)(1)(a) of this section for felonies committed as part of the same act or transaction." The General Assembly thus established a default prohibition against cumulative specification sentences for the same transaction. Division (B)(1)(g) creates an exception—but only for the narrowly enumerated felonies. When, as here, the enumerated felony (aggravated robbery) and the merged count (attempted grand theft) are the "same offense" under *Blockburger* because one is a lesser included offense of the other, the cumulative punishment for specifications on both offenses exceeds what we can conclude the legislature clearly authorized.

{¶141} A supplementary and reinforcing argument is that a firearm specification is a sentencing enhancement that rises and falls with a conviction of the underlying offense. *See Ford*, 2011-Ohio-765, at paragraph one of the syllabus (holding that "a firearm specification is a penalty enhancement, not a criminal offense"); *Logan*, 2025-Ohio-1772, at ¶ 9-12 (reaffirming this principle). When the predicate offense is merged and not sentenced—and thus not "convicted" under *Whitfield*—the specification lacks a predicate on which to operate. *See id.*, 2010-Ohio-2, at ¶ 12.

{¶142} *Bollar* held that R.C. 2929.14(B)(1)(g) provides a statutory exception that keeps the specification alive even when the underlying count is merged. *Id.*, 2022-Ohio-4370, at ¶ 16. But this holding—which depends on redefining "convicted"—must now be

Case No. 2025-L-113

read in light of *Barrett*'s insistence on clear legislative authorization for cumulative punishment of the same offense. *Id.*, 146 S.Ct. at 491. Where, as here, the merged offense is not merely an allied offense but a lesser included offense of the surviving count, and where the firearm specifications on both counts punish the identical firearm conduct, we hold that the imposition of the second specification sentence exceeds the punishment that the General Assembly clearly authorized and violates the Double Jeopardy Clause.

{¶143} As the Ohio Supreme Court candidly acknowledged in *Beatty*, 2024-Ohio-5684, at ¶ 28, "Ohio's criminal-sentencing scheme is a bloated labyrinth of specialized provisions, inter- and intra-statutory cross-references, exceptions, and exceptions to exceptions." Labyrinthine complexity is the antithesis of clear legislative authorization. Where the statutory framework is so convoluted that the Ohio Supreme Court itself must redefine established legal terminology (*Whitfield*'s definition of "conviction") to reach the cumulative-punishment result, and where the resulting sentence punishes the same firearm conduct twice through specifications on what *Barrett* would recognize as the same offense, we cannot say with the clarity the Constitution demands that the General Assembly authorized this outcome.

{¶144} We are mindful that *Bollar* is binding Ohio authority. However, *Barrett*, 607 U.S. ___, 146 S.Ct. 482, supplies a federal constitutional overlay that was not before the *Bollar* court. Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, when a state sentencing scheme, as applied, produces cumulative punishment for the same offense under the *Blockburger* framework without clear legislative authorization, the Fifth Amendment—as interpreted by the United States Supreme Court—imposes an independent limitation that this court must honor. We hold that the imposition of a second

Case No. 2025-L-113

consecutive three-year mandatory firearm specification on the merged attempted grand theft of a motor vehicle count—a lesser included offense of the aggravated robbery for which no sentence was imposed—violates the Double Jeopardy Clauses of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution. The three-year specification on the merged count is vacated.

*C. Corrected Application of R.C. 2929.14(B)(1)(g) Following Vacation of the Second Specification*

{¶145} With the vacation of the three-year specification on the merged attempted grand theft count, the remaining firearm specifications are the three-year specification on the aggravated robbery (a R.C. 2941.145 specification) and the one-year specification on the receiving stolen property (a R.C. 2941.141 specification). Under R.C. 2929.14(B)(1)(g), the sentencing court "shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications . . . ." Because only two specifications remain, these are necessarily the "two most serious . . . ." The three-year specification is the most serious, and the one-year specification is the second most serious. Both are mandatory under (B)(1)(g), and R.C. 2929.14(C)(1)(a) requires mandatory specification prison terms to be served consecutively. The trial court imposed the one-year specification consecutively. This was correct.

{¶146} Accordingly, Mr. Hagwood's eighth assignment of error—challenging the consecutive nature of the one-year specification under *Beatty*, 2024-Ohio-5684—lacks merit as to that specification. Under our corrected sentencing framework, the one-year specification is mandatory under (B)(1)(g) as the second most serious specification, and

Case No. 2025-L-113

*Beatty*'s holding regarding the concurrent presumption for *discretionary* specification terms does not apply to mandatory terms. R.C. 2929.14(C)(1)(a) governs, and it requires consecutive service. The eighth assignment of error is well-taken only insofar as the second three-year specification is vacated on double jeopardy grounds as set forth above.

{¶147} Under his ninth assigned error, Mr. Hagwood claims the trial court erred by failing to specify which firearm specifications constituted the "two most serious" under R.C. 2929.14(C)(1)(a)-(b) and by relying on the repealed version of R.C. 2929.14(B)(1)(g). In light of our vacation of the second three-year specification, only two specifications remain, eliminating the need for the trial court to identify the "two most serious"—they are the only two. To the extent the trial court relied on a prior version of R.C. 2929.14(B)(1)(g), the current version of the statute produces the same result: the two remaining specifications are mandatory and consecutive. This assignment of error is rendered moot by our disposition above.

{¶148} Under his tenth assigned error, Mr. Hagwood argues the trial court imposed consecutive firearm-specification prison terms in express reliance on a repealed statutory provision. To the extent this argument overlaps with the ninth assignment, it is likewise moot. The corrected sentence is imposed under the current version of R.C. 2929.14(B)(1)(g) and (C)(1)(a).

### D. Corrected Sentence

{¶149} In light of our disposition of the foregoing sentencing issues, Mr. Hagwood's sentence must be corrected. The three-year mandatory firearm specification on the merged attempted grand theft count is vacated as violative of double jeopardy. The remaining specifications—the three-year specification on the aggravated robbery and the

Case No. 2025-L-113

one-year specification on the receiving stolen property—are the "two most serious" under R.C. 2929.14(B)(1)(g) and are mandatory and consecutive under R.C. 2929.14(C)(1)(a). The corrected sentence is therefore: an indefinite term of four to six years on the aggravated robbery count, served concurrently with 18 months on the receiving stolen property count, preceded by a mandatory three-year firearm specification and a mandatory one-year firearm specification, both served consecutively and prior to the underlying sentences. The corrected aggregate sentence is an indefinite term of eight to ten years.

{¶150} Mr. Hagwood's eighth assignment of error is well-taken in part and without merit in part.

{¶151} Mr. Hagwood's ninth and tenth assignments of error are rendered moot by our disposition of his eighth assignment of error.

**X. Cumulative Error**

{¶152} For his eleventh and final assignment of error, Mr. Hagwood claims:

"The cumulative effect of the errors at trial deprived appellant of a fair trial and due process of law."

{¶153} Because this court has found no errors in the course of the trial, the cumulative-error doctrine is inapplicable as to the trial proceedings. The sentencing error we have identified is corrected by our disposition above.

{¶154} Mr. Hagwood's eleventh assigned error is without merit.

**XI. Conclusion**

{¶155} For the reasons discussed in this opinion, the judgment of the Lake County Court of Common Pleas is affirmed in part, reversed in part, and remanded for the limited

Case No. 2025-L-113

purpose of the trial court to enter judgment on sentence reflecting the vacation of the three-year firearm specification on the merged attempted grand theft of a motor vehicle count. The corrected aggregate sentence is an indefinite term of eight to ten years.

MATT LYNCH, P.J.,

SCOTT LYNCH, J.,

concur.

Case No. 2025-L-113

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error one through seven, as well as assigned error eleven, are without merit. Assignment of error eight has merit in part and is without merit in part. Assigned errors nine and ten are rendered moot by this court's disposition of the eighth assigned error. It is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas is affirmed in part, reversed in part, and remanded for the limited purpose of the trial court to enter judgment on sentence reflecting: (1) the vacation of the second three-year mandatory firearm specification on the attempted grand theft of a motor vehicle count as violative of the Double Jeopardy Clauses of the Fifth and Fourteenth Amendments to the United States Constitution, Article I, Section 10 of the Ohio Constitution, and *Barrett v. United States*, 607 U.S. ___, 146 S.Ct. 482 (2026); and (2) the corrected aggregate sentence of an indefinite term of eight to ten years, reflecting the mandatory consecutive service of the remaining three-year and one-year firearm specifications under R.C. 2929.14(B)(1)(g) and (C)(1)(a).

Costs to be taxed against the parties equally.



JUDGE EUGENE A. LUCCI

PRESIDING JUDGE MATT LYNCH,
concurs

JUDGE SCOTT LYNCH,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case No. 2025-L-113